CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAR 20 2007
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| KEVIN R. WILLIAMS, <br> Plaintiff, | ) <br> ) Civil Action No. 7:07cv00019 |
| v. | ) |
| MS. BAYS, et al., <br> Defendants. | ) By: Hon. Michael F. Urbanski <br> ) United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Kevin R. Williams ("Williams"), an inmate proceeding pro se, filed this action pursuant to 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343.[1] Williams alleges that the defendants failed to provide him with adequate medical care, subjected him to cruel and unusual living conditions, and transferred him to his current facility to retaliate against him. Williams seeks several forms of injunctive relief,[2] as well as a total of $2,250,000 in damages. By Order entered March 16, 2007, this action was referred to the undersigned to submit a recommended disposition of Williams' claims.

Upon review of Williams' complaint and his attachments, the undersigned finds that

---

[1] Williams filed these claims in a previous civil rights action, pursuant to 42 U.S.C. § 1983, on January 19, 2005. See Civil Case No. 7:05cv00025. However, he later filed a motion to voluntarily dismiss that case, which the court granted on December 22, 2005. While many of Williams' claims began to accrue more than two years before he filed the instant action, the statute of limitations on his claims may be tolled by his filing of the previous action. See Clymer v. Grzegorek, 515 F.Supp. 938 (E.D. Va. 1981). However, it is not necessary for the undersigned to make that determination because none of Williams' allegations state a claim upon which relief may be granted.

[2] Williams seeks an injunction forbidding the defendants from further denying him adequate mental health care; requiring the defendants to transfer him to a prison within the Virginia Department of Corrections ("VDOC") with adequate mental health services; forbidding the defendants from "locking him up in segregation units without due process;" requiring the defendants to refrain from retaliatory actions against him for filing the instant action; ordering the Warden and VDOC officials to turn off the lights in cells at Wallens Ridge at night for at least 8 hours; and requiring the defendants to pay for and guarantee eye surgery to restore his vision. Claims for injunctive relief become moot when a prisoner is no longer subjected to the condition complained of. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Ross v. Reed, 719 F.2d 689, 693 (4th Cir. 1983). As Williams has been transferred to Keen Mountain Correctional Center, he is no longer subjected to the conditions he complained of in this action, therefore the undersigned finds his claims for injunctive relief are moot and recommends that they be summarily dismissed.

Williams' allegations fail to state a claim upon which relief may be granted. Therefore, the undersigned recommends that Williams' complaint be summarily dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

## I.

On August 3, 1999, the Greensville County General District Court committed Williams to Marion Correctional Treatment Center ("Marion"). While there for two years, Williams states that he was placed on various psychotropic drugs as well as cogentin, a side-effect suppressor. After being prescribed this drug regimen, Williams complained to his doctor at Marion that his vision was blurred. His doctor allegedly told him that it was a side effect of his medications and then prescribed him glasses, telling Williams that his vision would eventually return. Williams was discharged from Marion in September of 2001 and transferred to Greensville Correctional Center's Mental Health Unit ("Greensville").

Thereafter, on February 19, 2002, Williams was transferred from Greensville to Wallens Ridge State Prison ("WRSP"). Williams claims that from that day until the present he has exhibited "signs of severe mental illness," including suicide attempts, smearing feces on his face, successive days without eating, "irrational thoughts expressed verbally concerning Nazis and him being Albert Einstein," depression, insomnia, anxiety, and visual and auditory hallucinations. From February 2002 to February 2003, Williams states he was confined in a segregation unit at WRSP.

In February 2003, Williams was placed in general population housing at WRSP and celled with one other inmate. Williams alleges that in several sessions with defendant Dr. Ahsan, Psychiatrist at WRSP, he told Dr. Ahsan that he "didn't trust his cell partners," that "they watch him," "they'll kill him in his sleep," and they "steal his nuclear secrets." Dr. Ahsan did not

2

recommend Williams to a single cell.

On February 26, 2004, defendant Bays, Senior Psychologist at WRSP, was called by prison officials to respond to Williams' claims that he was hearing voices and that the correctional officers were trying to kill him. Williams told psychologists that he had given his cellmate a "serum" on that day which caused his cellmate to pass out. Apparently, that serum was actually Williams' own psychotropic medication that he had put in his cellmate's food or coffee in an attempt to "elicit the truth out of him." As a result of this incident, Bays placed Williams in segregation for his safety and so that he could be medically treated.

On March 2, 2004, Williams requested to see Bays because "it was an emergency." Bays allegedly came to see him the following day because that was the day she made rounds in his building. Two days later, on March 4, 2004, Williams states he was seen by Dr. Ahsan who did not recommend any treatment plan or prescribe any medication for Williams but did inform him that he would remain in segregation for six to eight weeks. The next day Williams met with counselors Huff and Hensley for his ICA hearing and was formally placed in segregation.

On March 8, 2004, Williams claims he swallowed a razor and had a hanging noose on his cell vent. Sergeant Young and Lieutenant Harris responded to his cell where Williams was allegedly unresponsive. After Williams refused to be handcuffed, he was extracted from his cell with an electric shield and on March 8 or 9, 2004, Williams was taken to the medical unit to have an x-ray, which verified that two razors were in his abdomen. Thereafter, Williams was placed in a mental health cell and placed on suicide watch with no mattress or pillow and only a safety blanket and smock. On March 10, 2004, he was given a mattress. On March 15, 2004, Williams claims he was placed back in segregation without being x-rayed to ensure that the razors had passed through him.

3

In April 2004, Williams was placed back into general population at WRSP, despite his unsuccessful request to defendant Jones, a psychologist at WRSP, for a single cell. Around June 2004, Williams was assigned a cellmate and thereafter complained that he did not trust his cell mate and could not sleep around him. He also claimed that his cellmate might kill him in his sleep, was watching him, and was reading his thoughts.

Around July 2004, Dr. Ahsan discontinued Williams' medication and he has not been on medication since.[3] On November 8, 2004, Williams spoke to Jones and asked to be put back on his medication, but his request was denied. Williams again requested psychotropic medication on September 10, 2005 and October 26, 2005, but his request was denied by Jones on both occasions because Jones stated he did not need such treatment.

Williams claims that on December 10, 2004, he asked Assistant Warden Harvey to be placed in a single cell. However, based on a note by Jones in Williams' file, his request was denied because he did not qualify for a single cell. Over one year later, on December 30, 2005, Williams filed a complaint with Jones regarding a move to a single cell; however, this request also was denied. Williams states that he has filed "several" other grievances concerning a single cell, all of which have been unsuccessful.

Williams further complains that the lights are left on 24 hours a day at WRSP, with bright lights from 5:30 AM to 10:00 PM and dimmed lights at night. Williams claims he visited the opthamologist approximately six times while he was housed at WRSP. On September 10, 2006, Williams was seen by an opthamologist, Dr. Owens, to whom he expressed concern about the

---

[3] Williams gives conflicting dates in his complaint as to when he was taken off his medication. On one occasion he states he was taken off the medication in November 2005, but on multiple other occasions he states July 2004. Furthermore, the medical records, provided by Williams as evidence in support of his claims, show that he was on his medication in December, 2004. For the purposes of this opinion, the undersigned will use the July 2004 date, however, it should be noted that the outcome would not change if November 2005 were presumed correct.

4

constant lighting and how it may have impaired his vision. Dr. Owens allegedly told Williams that a number of factors, including constant illumination, could affect his vision but was not specific about which factor(s) may have affected him. Dr. Owens told Williams that he would refer him to the medical department to see if eye surgery was necessary and if he qualified for it. Williams further avers that his eyesight has deteriorated because he was not prescribed cogentin, a side effect suppressor, and that his psychotropic medications were causing his vision to worsen.

On September 7, 2006, Dr. Evans allegedly went to Williams' pod to speak with him about the instant action, asking what he wanted out of it. After their conversation, Williams claims that Dr. Evans told him that he was "going to see to it that Williams got transferred as soon as possible." On September 12, 2006, Williams was sent to Keen Mountain Correctional Center ("Keen"). Williams alleges that he was transferred by the defendants in retaliation for him filing his suit. On September 21, 2006, Williams' former attorney wrote to him saying that he could no longer represent him based on the distance between them. Further, Williams claims that his former cellmate at WRSP wrote his original complaint, and now that he has been transferred he "suffers without . . . such assistance."

In his current action, Williams alleges that the defendants failed to provide him with adequate medical care by denying him a single cell, placing him in segregation for two months, denying him specific medications, and denying his transfer to another facility; subjected him to cruel and unusual living conditions where the lights were on in his cell for 24 hours a day; and transferred him to his current facility to retaliate against him.

## II. Denial of Medical Care

In order to state a cognizable claim for denial of medical care under the Eighth Amendment,

Case 7:07-cv-00019-SGW-mfu   Document 10   Filed 03/20/07   Page 5 of 11   Pageid#: 231

a plaintiff must allege facts sufficient to demonstrate deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To establish deliberate indifference, a plaintiff must present facts to demonstrate that the defendant had actual knowledge of and disregard for an objectively serious medical need. Farmer v. Brennan, 511 U.S. 825 (1994); see also Rish v. Johnson, 131 F.2d 1092, 1096 (4th Cir. 1997). A claim regarding a disagreement between an inmate and medical personnel over diagnosis or course of treatment and allegations of malpractice or negligence in treatment do not state cognizable constitutional claims under the Eighth Amendment. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Estelle, 429 U.S. at 105-06. Moreover, claims of medical judgment, including those related to psychological treatment, are not subject to judicial review. Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Bowring v. Mills, 551 F.2d 44 (4th Cir. 1976). The undersigned finds that Williams has not shown deliberate indifference by the defendants as to any of his claims and rather all of his claims amount to nothing more than a doctor-patient disagreement.[4]

## A. Denial of a single cell and failure to transfer

Williams claims that the defendants denied him adequate medical care by denying him a single cell and failing to transfer him. Williams argues that because he suffers severe psychosis, attempted suicide on several occasions, did not trust his cellmate (because he might "kill him in his

---

[4] Further, even if Williams could show deliberate indifference by medical personnel at WRSP, a medical treatment claim cannot be brought against a supervisory official absent an allegation that the official was personally connected with the denial of medical treatment. Vinnledge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977). This entails a showing that the supervisor failed to promptly provide an inmate with needed medical care, deliberately interfered with a prison physician's performance, and/or tacitly authorized or was indifferent to a prison physician's constitutional violation. Miltier, 896 F.2d at 854. Moreover, supervisory officials are entitled to rely on medical judgments made by prison physicians. Id. at 854-55. Williams does not show that defendants Warden Robinson and Assistant Warden Harvey interfered with his receipt of medical treatment, rather, Williams concedes and his medical records indicate that he has received treatment. As Williams has failed to allege any specific facts demonstrating Robinson or Harvey were personally involved in the medical care Williams received, Robinson and Harvey cannot be liable under the doctrine of respondeat superior.

6

Case 7:07-cv-00019-SGW-mfu   Document 10   Filed 03/20/07   Page 6 of 11   Pageid#: 232

sleep," was "watching him," and was "reading his thoughts"), tried to drug his cellmate, and could not sleep with this cellmate present, the defendants should have assigned him to a single cell and/or transferred him to another facility. Williams made several requests and complaints to mental health professionals and other prison authorities to be moved to a single cell, both in person and through grievances, however, all of his requests were denied. Williams states that the "agony" he suffered while living in general population, "could have been relieved by placing him in a single cell" and that the defendants were deliberately indifferent to his medical needs by denying his requests. Williams claims that given his mental health history and the incidents that took place while he was incarcerated at WRSP, the defendants should have recommended his transfer to another facility that could adequately meet his mental health needs. Williams does not allege that he requested to be transferred but does state that he complained about the quality of the mental health care he received at WRSP. Williams admits that mental health professionals at WRSP examined him on numerous occasions, rendered diagnoses, and determined that he did not need to be housed in a single cell and that he did not need or qualify for a transfer to a another prison. Accordingly, though Williams may desire a single cell and/or to be transferred, the undersigned finds his claims amount to nothing more than a doctor-patient disagreement regarding proper course of treatment, which is not actionable under the Eighth Amendment.

### B. Placement in Segregation

Williams was placed in segregation because he put psychotropic drugs in his cellmate's food or coffee, causing him to pass out and requiring medical treatment. However, before he was placed in segregation, he met with Bays, a qualified mental health professional, who decided that he needed to be segregated in order for him to be treated and for his safety. Williams alleges that the

7

defendants denied him adequate medical care while he was in segregation for two months, between February 26, 2004 and April, 2004.[5] He claims that the defendants did not treat him for mental illness or see him regularly while he was in segregation. However, his own account of the facts contradicts this assertion. Shortly after being placed into segregation, Williams swallowed two razors and had a noose hanging in his cell. After being examined by the medical department, including x-rays, he was placed in a mental health cell for approximately one week where he was on suicide watch. Thereafter he was placed back into a segregation unit. Williams concedes that he was seen by mental health professionals on at least three occasions, not including the week he spent under constant supervision in the mental health unit. In addition, Williams concedes that he was on psychotropic medication regimen at this time to treat his illness. Accordingly, the undersigned finds that Williams' claims do not meet the standard for an Eighth Amendment claim and therefore recommends that they be dismissed.

## C. Denial of medication

Williams claims that the defendants were deliberately indifferent to his medical needs because they denied him psychotropic medication and cogentin, a side effect suppressor. Williams states that when he arrived at WRSP, his psychotropic medication regimen from his previous

---

[5] To the extent that Williams' claim regarding his placement in segregation can be construed as a denial of procedural due process, it also fails. In order to prevail on a procedural due process claim, an inmate must first demonstrate that he was deprived of "life, liberty, or property" by governmental action. Bevrati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997). Although prisoners are afforded some due process rights while incarcerated, those liberty interests are limited to "the freedom from restraint which, while not exceeding the sentence in such and unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Changes "in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison." Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991). Further, prisoners do not have a constitutionally recognized liberty interest in a particular security classification nor a constitutional right to be confined in a particular prison. Hewitt v. Helms, 459 U.S. 460, 468 (1983); Meachum v. Fano, 427 U.S. 215, 224 (1976). Therefore, the undersigned finds that Williams has failed to state a claim of constitutional magnitude as to a due process claim.

8

institution was continued, but that his prescription for cogentin was not. He further alleges that before arriving at WRSP he had "very good vision," but throughout his stay at WRSP, his vision continually worsened. Williams avers that it was the lack of cogentin that caused his vision to decline. Williams concedes that he visited the prison ophthalmologist at least six times during his incarceration there and the doctor told him that several factors could contribute to his vision impairment, but did not state that the lack of cogentin affected his vision in any way. Williams also claims that around July 2004, he was taken off his psychotropic medication regimen by defendant Jones despite Williams' allegations that he suffered hallucinations, depression, insomnia, anxiety, and other symptoms. Williams claims that on at least three occasions over the next two years, he requested to be put back on his medication. All of his requests were allegedly denied stating that he did not need the medication at that time. Furthermore, the medical records that Williams provided to support his claims show that he was seen by mental health professionals and medical professionals many times after July 2004, and his mental health was re-assessed each time. Accordingly, though Williams may desire specific medications, the undersigned finds his claims amount to nothing more than a patient-doctor disagreement regarding proper course of treatment, which is not actionable under the Eighth Amendment.

### IV. Living Conditions

In order to state a claim of constitutional significance regarding prison living conditions, a plaintiff must allege, among other things, facts sufficient to show either that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions or that the conditions have created an unreasonable risk of serious damage to his future health. Strickler v. Waters, 989 F.2d 1375, 1380-81 (4th Cir. 1993); Helling v. McKinney, 509 U.S. 25 (1993).

9

Case 7:07-cv-00019-SGW-mfu   Document 10   Filed 03/20/07   Page 9 of 11   Pageid#: 235

While Williams alleges that he was subjected to constant illumination in his cell, he concedes that the lights are dimmed for seven and one half hours each night. He also alleges that due to the "excess illumination" his vision has worsened. However, he bases this conclusion on his own diagnosis and not one of a medical professional. In fact, by his own account, he has been seen by the opthamologist at least six times and not once has the doctor concluded that his alleged vision problems are a result of his exposure to constant light. Accordingly, the undersigned finds that Williams has not alleged any significant injury or risk of future injury due to his exposure to light and has therefore failed to state a claim under the Eighth Amendment.

## V. Retaliatory Transfer

Williams asserts that the defendants retaliated against him by transferring him to Keen because he filed this civil rights action. However, he does not allege any specific facts to support his allegation. An inmate must point to specific facts which tend to support his allegation of retaliation. White v. White, 886 F.2d 271 (4th Cir. 1989). Bare assertions of retaliation do not establish a claim of constitutional dimensions. Adams v. Rice, 40 F.2d 72 (4th Cir. 1994) (federal courts should regard inmate claims of retaliation with "skepticism"). The undersigned finds that Williams' conclusory allegations of retaliation, even when viewed in the light most favorable to him, fail to state a claim on which relief may be granted under 42 U.S.C. § 1983.

## IV.

For the reasons stated above, the undersigned finds that Williams' claims fail to state a claim upon which relief may be granted. Therefore, the undersigned recommends that Williams' complaint be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

The Clerk is directed to immediately transmit the record in this case to the Honorable Samuel

10

Case 7:07-cv-00019-SGW-mfu Document 10 Filed 03/20/07 Page 10 of 11 Pageid#: 236

G. Wilson, United States District Judge. Williams is advised that pursuant to Rule 72(b), he is entitled to note objections, if he has any, to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusions of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon plaintiff. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by the reviewing court as a waiver of such objection.

Further, the Clerk is directed to send a certified copy of this Report and Recommendation to Williams.

**ENTER**: This 20th day of March, 2007.

Michael F. Urbanski
United States Magistrate Judge

11